**21-03042MB**

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41
## FOR A WARRANT TO SEARCH AND SEIZE

I, Richard Eustis, Special Agent (SA) of Homeland Security Investigations (HSI), being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property described in **Attachment A.I.**, which is currently in law enforcement possession, and the extraction from that property of electronically stored information described in **Attachment A.II**.

2.      I am an investigator or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), and am empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in 18 U.S.C. § 2516.

3.      I have been a Special Agent with HSI since July 2018.  Prior to becoming an HSI Special Agent, I was a United States Supervisory Border Patrol Agent.  I have over nineteen years of experience conducting law enforcement and criminal investigations into violations of federal law, including financial crimes, child exploitation, drug trafficking, and human smuggling.

4.      As a Special Agent with HSI, I am responsible for investigating violations of federal law, to include those enumerated in Title 8, Title 18, Title 19, Title 21, and Title 31 of the United States Code.  In preparing to become a Special Agent, I attended the Criminal Investigator Training Program and the HSI Special Agent Training at the Federal Law Enforcement Training Center in Glynco, Georgia.  I received my bachelor's degree in Anthropology from the College of Charleston in 1995.

5.      During my law enforcement career, I have participated in numerous drug trafficking investigations involving violations of state and federal law.  I have been involved in coordinated surveillance operations (both physical and electronic), conducted seizures, and led or assisted in interrogations of violators and interviews of witnesses.  I

am familiar with the federal procedures involved in the execution of federal search warrants. Further, I have executed search warrants for persons and places connected with the possession, manufacturing, and distribution of controlled substances. I received Title III training in the academy, received guidance in Title III investigations from co-workers with extensive experience, and worked on Title III investigations.

6.     Through collective experience, I have become familiar with how drug trafficking organizations (DTOs) operate. I am familiar with how DTOs conceal, package, smuggle, transport, store, and distribute drugs as well as how they collect and launder drug proceeds. Additionally, I am familiar with the tactics employed by DTOs to counter law enforcement investigative techniques. I am also familiar with how drug smugglers use cellular phones and other electronic devices to coordinate and facilitate their illicit activities.

7.     Based on my training, experience, and conversations with other law enforcement officials, I know that the experienced and well-structured DTOs usually compartmentalize their illegal operations. These organizations subcontract their operations to other organizations and transportation cells who work independently from one another to facilitate the smuggling of controlled substances. These cells carry out different tasks, including the receipt and transportation of the controlled substances from the source country, the importation/smuggling of the controlled substances into the United States, the temporary storage of the controlled substances as they await follow-on transportation, the transportation of the controlled substances to different cities within the United States, and the transportation of bulk cash derived from the sale of controlled substances back to the source(s) of supply.

8.     Based on my training and experience, and conversations with other law enforcement officials, I know that the compartmentalization of operations reduces the amount of knowledge possessed by each member of the organization. This method of operation minimizes the potential damage a cooperating individual could inflict on the organization and further reduces the adverse impact of a particular law enforcement action against the organization.     However, I have observed that, even in the most

compartmentalized organizations, there is often contact between the cells, as well as frequent contact between the cells and upper management.

9.      Based on my background, training, and experience, I also know that drug trafficking requires a high degree of constant coordination among the participants. The cheapest and easiest way to facilitate this coordination is through use of cellular telephones. I know that individuals involved in illicit drug trafficking often use cellular telephones to arrange, coordinate, and monitor criminal activities, including communicating between/among buyers, sellers, coordinators, scouts, stash house operators and couriers/transporters. They also use cellular telephones to communicate among themselves while performing counter-surveillance activities, and to warn other co-conspirators of the presence of law enforcement or other obstacles to their criminal plans. Additionally, if a member of the organization is intercepted or arrested by law enforcement, other participants will use cellular telephones to alert each other as soon as possible so the group may take steps to hide or destroy evidence or otherwise conceal its activities.

10.     In addition, I know from experience that individuals engaged in drug trafficking will use and carry multiple cellular telephones, often at the same time, and repeatedly change cellular telephones to avoid detection by law enforcement. To further evade law enforcement, they often will subscribe to a telephone using fictitious identifiers (e.g., false names and/or addresses) or in other people's names.

11.     Finally, I know that traffickers often avail themselves of all the communication technologies available within the particular cellular telephone, including voice messaging, texting, audio communication, direct dial, push-to-talk, emailing, internet access, speed dial, taking and storing photos and video, and maintaining contact lists containing contact information for their criminal associates to accomplish their criminal activities. Traffickers also will access third-party applications (e.g., WhatsApp, Facebook, Instagram) via their cellular phones to perform these same functions. I also am aware that most cellular telephones and third-party applications have the capacity to collect and store precise GPS data documenting the phone's physical location over time.

/ / /

12.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter.  I make this affidavit partly based on personal knowledge derived from my participation in this investigation and partly on information that other law enforcement officers and witnesses have reported to me.  Such statements are among many made by others and are relayed here in substance, unless otherwise indicated.

## IDENTIFICATION OF THE DEVICES TO BE EXAMINED

13.     The properties to be searched, as described in **Attachment A.I.**, are as follows:

a.  One black Samsung cellular telephone, bearing identification number 355182110367742 (**Target Device A**);

b.  One red T-Mobile cellular telephone, bearing identification number 15729000104205 (**Target Device B**);

c.  One white Apple iPhone cellular telephone in a teal case, bearing identification number 353102105520891 (**Target Device C**);

d.  One black Samsung cellular telephone, bearing identification number 355356112835555 (**Target Device D**);

e.  One black TCL cellular telephone (**Target Device E**);

f.  One blue Cricket cellular telephone (**Target Device F**);

g.  One black Apple iPhone cellular telephone, bearing identification number 356474104960809 (**Target Device G**);

h.  One black Verizon cellular telephone, bearing identification number 352157108298813 (**Target Device H**);

i.  One black Samsung cellular telephone, bearing identification number 352656110918854 (**Target Device I**);

j.  One black Apple iPhone cellular telephone, bearing identification number 352895117318797 (**Target Device J**); and

k.  One black Samsung cellular telephone, bearing identification number 355357112073460 (**Target Device K**).

Target Device A was seized incident to the arrest of Patrick Michael LA FEVER.  Target Devices B through D were seized incident to the arrest of Amanda Rachelle MILLER. Target Devices E through K were seized incident to the arrest of Jamaar Charles SAMUELS and Joseph ACOSTA.  Collectively, Target Devices A through K are referred to as the Target Devices.  All Target Devices were seized on November 12, 2020 in Tucson, Arizona and were ultimately transferred into HSI custody.

14.    The Target Devices are currently located at a secure HSI storage facility in Nogales, Arizona.  In my training and experience, I know the Target Devices have been stored in a manner in which their contents are, to the extent material to this investigation, in substantially the same state as they were in when they first came into the possession of HSI.

15.    As discussed below in detail, the Target Devices came into law enforcement possession incident to the arrest of LA FEVER, MILLER, SAMUELS, and ACOSTA.  The applied-for warrant would authorize the forensic examination of the Target Devices for the purpose of identifying electronically-stored data particularly described in Attachment A.II.  Based upon my training, experience, and understanding of this investigation, I believe the Target Devices are capable of maintaining evidence as set forth in Attachment A.II., to include photographs, messages, web searches, location data, and other contacts.

## PROBABLE CAUSE

### Drug Smuggling Arrest of LA FEVER on April 24, 2020

16.    On April 24, 2020, at 3:00 p.m., LA FEVER and Dania Shalyn HARGETT attempted to enter the United States via the DeConcini Port of Entry (POE) in Nogales, Arizona in a white 2005 Chevrolet Trailblazer bearing Arizona license plate CTZ0166.[1] The Trailblazer was registered to Patrick Michael LA FEVER at an address in Tucson, Arizona.  LA FEVER was driving and HARGETT was the sole passenger.

17.    During primary inspection, Customs and Border Protection officers (CBPOs) observed that both LA FEVER and HARGETT appeared to be nervous and confused.  The

---

[1] All times are approximate.

CBPOs further observed what appeared to be evidence of intravenous drug use in the form of track marks on their arms.

18.     CBPOs directed LA FEVER and HARGETT to secondary inspection.

19.     In secondary, CBPOs x-rayed the Trailblazer and saw anomalies within the rear passenger door panel of the vehicle.

20.     A CBPO canine then conducted a sniff of the Trailblazer and alerted to the presence of drugs in the rear passenger door panel of the vehicle.

21.     CBPOs searched the Trailblazer and discovered six packages concealed within the rear passenger door panel of the vehicle. A sample of the packages' contents field tested positive for the properties of heroin; the total weight was found to be approximately 1.56 kilograms. In the driver's side door panel of the Trailblazer, CBPOs also located a global positioning system ("GPS") tracking device.

22.     LA FEVER and HARGETT were placed under arrest. A black Motorola XT 1952DL cellular telephone, denominated as TD #1 in this investigation, was located on LA FEVER's person upon initial encounter. Per standard operating procedure, during secondary inspection, a CBPO asked both LA FEVER and HARGETT to remove their cell phones and place them on the front dashboard while the vehicle was inspected. After the arrest, TD #1 was taken and booked into evidence. HARGETT also possessed a telephone, but it was returned upon her release from custody (see below).

**Post-Arrest Statement of HARGETT**

23.     At 5:40 p.m., I approached LA FEVER to conduct a custodial interview; however, LA FEVER invoked his *Miranda* rights and did not provide a statement.

24.     At 5:47 p.m., I met with HARGETT in the interview room at the DeConcini POE. At 5:53 p.m., she waived her right to counsel and agreed to speak with me.

25.     HARGETT explained that, on the morning of April 24, 2020, LA FEVER had told her of his intention to travel to Mexico to pick up and smuggle drugs into the United States. LA FEVER told her that people were going to put "something" (i.e., drugs) in the car and that the less she knew, the better.

26.     According to HARGETT, she and LA FEVER crossed into Mexico and parked the vehicle very near the international border.  LA FEVER informed HARGETT that he had left the keys in the gas cap area so that someone else could recover the vehicle.

27.     HARGETT said that she and LA FEVER then went to find a dentist and eat lunch.  As they walked away from the vehicle, she asked to go back and recover some personal items from it. LA FEVER refused, however, stating that the vehicle was to be taken by someone else.

28.     HARGETT stated that she and LA FEVER spent the afternoon at the dentist, eating lunch and awaiting the return of the vehicle.  They waited close to the original place where they had parked it.  HARGETT further said that LA FEVER's telephone battery had died, so he would frequently check to see if the vehicle had been returned.

29.     According to HARGETT, once LA FEVER discovered that the vehicle had been returned, they went back to it.  Once they got into the vehicle, LA FEVER plugged in his phone and called an unknown person who HARGETT perceived to have a female voice.  She overheard the person who LA FEVER had called say something in English to the effect of "it did not go down," and LA FEVER told this person that he could not find the package in the vehicle.  They then proceeded to re-enter the United States.

30.     At 7:30 p.m., LA FEVER was asked for consent to search TD #1 for evidence that might refute his involvement in the smuggling event.  LA FEVER refused consent.

31.     Later records checks showed LA FEVER has a criminal history, including a felony conviction in 2017 involving possession or use of drug paraphernalia and a federal arrest in 2013 for possession with intent to distribute marijuana (the federal charges were later dismissed).

32.     HARGETT and LA FEVER were released from custody pending further investigation.

### TD #1 Is Found to Contain Evidence of Drug Trafficking

33.     On May 5, 2020, Magistrate Judge Jacqueline M. Rateau, District of Arizona, issued a warrant (20-07322MB) authorizing a search of LA FEVER's cell phone, TD #1, for evidence of drug trafficking activity in violation of federal law.

34.     Upon executing the search warrant, agents found text messages that seem to reference drug prices, availability and coordination for the pick-up and purchase of drugs. For example, beginning in late March 2020, there is an extended conversation between TD #1 and telephone number 520-400-3165, stored in TD #1 as "Michelle Husband's Chino". Late on March 31, 2020, LA FEVER, using TD #1, sent the following text message to 520-400-3165: "I need two whole ones".  Based on my training and experience, I believe that LA FEVER was requesting a quantity of drugs, as "whole ones" is coded language for narcotics.  After LA FEVER asks how much, "Michelle Husband's Chino" responds early on April 1, 2020: "600 its raw", which I interpret as $600 because the drug is in pure form ("raw").  LA FEVER expresses agreement with that price by writing: "That works for me ill let you know what time they are coming from out of state".  "Michelle Husband's Chino" then responds: "Cool we can also talk about sendin some 2 another state if u have the people i hav work".  In my training and experience, "Michelle Husband's Chino" is proposing a future discussion with LA FEVER about sending drugs to another state, telling him that if LA FEVER has people who can transport it, "Michelle Husband's Chino" can supply the drugs.  I know "work" is a common slang term for drugs.

35.     Agents also discovered a conversation between TD #1 and "Michelle Husband's Chino" that appears to be a preliminary discussion about the heroin importation event leading to LA FEVER's arrest.  Late on April 23, 2020, the night before the event, LA FEVER and "Michelle Husband's Chino" arrange to meet early on the morning of April 24, 2020.  LA FEVER tells "Michelle Husband's Chino" that he will be taking along "shay a white girl," which I believe is a reference to HARGETT whose middle name is Shalyn.  "Michelle Husband's Chino" assures LA FEVER that it will "all go smoothly" and tells him to "stic wit the plan".

36.     Additionally, agents discovered a conversation stored in TD #1 between two Facebook profiles: "Pat Lafever" (Facebook ID 100003325325693) and "Mochelle Gaurd" (Facebook ID 100049848885007).  The user of the "Mochelle Guard" profile self-identified in the conversation as "Michelle".  Based on my training, experience, and knowledge of this investigation, I believe the discussion between LA FEVER and Michelle

LNU, the relevant portion of which began on the morning of the April 24, 2020 heroin distribution event, concerned the coordination of that event among Michelle LNU, LA FEVER, "Chinos" or "Chino" and other unidentified co-conspirators. During the conversation, LA FEVER, among other things, shares his "live location" with Michelle LNU and "pins" the location of the Trailblazer on a map to enable other co-conspirators in Mexico to find it. He also tells Michelle LNU that he (LA FEVER) will leave the Trailblazer's keys in the gas cap area of the vehicle, corroborating HARGETT's post-arrest statement to that effect. LA FEVER ends up returning to the United States in the heroin-laden Trailblazer, though the Facebook conversation and a contemporaneous text message exchange appear to reflect some confusion among at least some of the participants about whether the Trailblazer was or was not loaded with drugs.

**LA FEVER Engages in Methamphetamine Sales to an Undercover Agent**

37.     Following LA FEVER's heroin trafficking arrest in April 2020, law enforcement officers began to proactively investigate LA FEVER's involvement in drug distribution, with the aim of identifying his source or sources of supply. Eventually, LA FEVER began to communicate with an undercover agent (the "UC"). LA FEVER used telephone number 520-401-7505, designated as TD #2 in the investigation, to speak with the UC. Over several months, the UC recorded calls and messages with LA FEVER in which LA FEVER, using TD #2, discussed the distribution and sale of drugs both within Tucson and to other parts of the United States.

38.     In late October 2020, after LA FEVER completed sales of smaller amounts of methamphetamine to the UC, LA FEVER, using TD #2, negotiated the sale of one pound of methamphetamine to the UC in exchange for $4,000 and set the transaction to occur on October 28, 2020.

39.     In anticipation of this transaction, on October 22, 2020, Magistrate Judge D. Thomas Ferraro, District of Arizona, issued warrants authorizing the geolocation/tracking of LA FEVER's cell phone (TD #2, 20-08942MB) and his Saturn vehicle (TV #1, 20-08941MB).

40.     On October 28, 2020, using a combination of physical and electronic surveillance, while conducting undercover recorded calls with LA FEVER over TD #2, investigators were able to follow LA FEVER as he traveled from Tucson to Nogales, Arizona in the afternoon, where he picked up a woman in a McDonald's parking lot, and then returned to Tucson in the early evening.

41.     At 7:26 p.m., the UC received the following text message from TD #2: "Ok i got to go to ina an oracle to pick that up so its going to be a min" and then "I'm on my way there now."  I interpret this to mean that LA FEVER would be picking up the drugs from a supplier near Ina and Oracle Roads in Tucson.  In another communication, when the UC asked LA FEVER if his supplier was ready for him, LA FEVER confirmed and said, "He has a couple of them for me," and started laughing.

42.     Agents surveilled LA FEVER as he drove to the Flamingo Suites Hotel, which is near Ina and Oracle Roads in Tucson.  Agents watched as an African-American man, later identified as Jamaar Charles SAMUELS, retrieved an object from a Lincoln MKZ, designated as TV #2 in this case, in the hotel parking lot and met with LA FEVER at LA FEVER's vehicle (TV #1).  After this encounter, LA FEVER left the area, drove across Tucson, and met the UC at a truck stop, where he ultimately delivered approximately one pound of suspected methamphetamine to the UC.  Based on all the circumstances, I believe SAMUELS supplied LA FEVER with the methamphetamine in question.

43.     Over the following days, as other agents and I attempted to identify the African-American man with whom LA FEVER had met, we learned that SAMUELS had rented a room at the Flamingo Suites Hotel and provided a contact telephone number for himself, which was designated as TD #3 in the investigation.

44.     Agents subsequently obtained telephone subscriber information and toll records for TD #3.  The records indicated that TD #3 had been activated on October 8, 2020. The records also showed that, beginning on or about October 27, 2020, there were multiple actual or attempted contacts between TD #2 (LA FEVER's number) and TD #3,

the number provided by SAMUELS to the Flamingo Suites Hotel.[2]  It should be noted, however, that TD #3 was not subscribed to in the name of SAMUELS.  The subscriber address also differed from the address listed on SAMUELS's Arizona identification card. As I note above, however, in my training and experience, use of alias subscriber information is not uncommon for those engaged in criminal activity.  Further investigation of telephone toll records showed that TD #2 (LA FEVER) and TD #3 (SAMUELS) had a third telephone number as a common contact between them.

### Arrest of LA FEVER and Seizure of Target Device A

45.     After the transaction on October 28, 2020, the UC remained in contact with LA FEVER at TD #2.  In early November 2020, the UC preliminarily negotiated to buy two pounds of methamphetamine from LA FEVER in exchange for $7,000.  The parties set the transaction to occur on November 12, 2020.

46.     On the morning of November 12, 2020, investigators conducted physical and electronic surveillance of LA FEVER in anticipation of the methamphetamine transaction with the UC.

47.     At 10:10 a.m., investigators located LA FEVER's vehicle (TV #1) parked behind the GLH Hotel at 1365 West Grant Road, Tucson, Arizona 85745.

48.     At 10:45 a.m., investigators served an administrative subpoena on the GLH Hotel requesting guest records.  GLH management informed investigators that the nighttime security guard observed LA FEVER on the property during the overnight shift. According to the management, LA FEVER previously had been excluded from the GLH Hotel under prior suspicion of dealing drugs out of the hotel.  GLH Hotel management further informed investigators that LA FEVER was staying with a female, Dania HARGETT, in Room 247.  HARGETT was present with LA FEVER during the April 2020 heroin importation event discussed earlier in this affidavit.  Hotel management stated HARGETT was due to check out at 11:00 a.m.

---

[2] The records do not specify the time zone; thus, it is unclear whether the service provider adjusted the toll records to local Arizona time.

49.     At 11:01 a.m., the UC called LA FEVER.  During the call, the UC increased his order to three pounds of crystal methamphetamine from LA FEVER in exchange for $10,500.  LA FEVER stated he was available to conduct the transaction right now at any time and he would just have to call "his person."  The UC arranged to conduct the deal with LA FEVER around 1:00 p.m.  LAFEVER stated he would verify everything was good when he was able to get a hold of "her" and find where "she" was at because that is likely where the product would be.

50.     At 11:31 a.m., the UC received an incoming text message from LA FEVER (TD #2).  The text message read: "ok its all set an ready it will be in the down town area when your reddy call me an ill let you know where."  The UC exchanged several more text messages with LA FEVER arranging the time and location of the deal.  LA FEVER sent another text message to the UC, which read: "with that much product I can only be gone for so long like 15 min where were you thinking".  The UC and LA FEVER then arranged to conduct the transaction at the TTT Truck Stop.

51.     At 11:51 a.m., investigators conducting surveillance of LA FEVER at the GLH Hotel observed LA FEVER leave the hotel in a Saturn matching the description of TV #1 with a female passenger.  Investigators conducted mobile surveillance of LA FEVER and saw him drive to the Villa Pacifica Apartments, located at 4650 East 29th Street, Tucson, Arizona.  Investigators did not observe LA FEVER exit the vehicle while at the Villa Pacifica Apartments.  LA FEVER then left the Villa Pacifica apartments and drove back towards Interstate 10.

52.     At 12:27 p.m., LA FEVER took the Interstate 10 exit ramp for Valencia Road.  At 12:29 p.m., investigators observed that the female was no longer in the vehicle with LA FEVER and LA FEVER was only accompanied by a dog.  Due to LA FEVER's circuitous routes of travel, investigators increased their following distance of LA FEVER and monitored the GPS tracker affixed to LA FEVER's vehicle (TV #1).

53.     At 12:44 p.m., the UC received a confirmation text from LA FEVER stating "ttt works," followed by an additional text message which read, "when will you be there?"

54.     At 12:47 p.m., investigators observed LA FEVER's vehicle in the parking lot of the Red Lion Inn and Suites Tucson Downtown, located at 222 South Freeway, Tucson, Arizona 85745. Investigators positioned themselves in a location to observe LA FEVER return to his vehicle. A few minutes later, investigators observed LA FEVER walk to his vehicle, open the hatchback, retrieve a black-and-white bag, and then walk into Room 120 at the Red Lion hotel.

55.     At 12:59 p.m., the UC placed an outgoing call to LA FEVER confirming that LA FEVER was still able to meet at 1:15 p.m. LA FEVER confirmed he was still good for 1:15 p.m. At 1:07 p.m., investigators observed LA FEVER return to his vehicle (TV #1) with the same black-and-white bag in his hand.

56.     At 1:08 p.m., the UC received an incoming call from LA FEVER. LA FEVER stated that he could not get his car to start. LA FEVER stated he was at the Red Lion off Interstate 10 and Congress. The UC said he would head to LA FEVER shortly but asked LA FEVER to try to get it started and come his way. At approximately 1:09 p.m., investigators conducting surveillance of LA FEVER observed LA FEVER push starting his vehicle. At 1:11 p.m., LA FEVER called the UC and informed the UC that he got his car to start and was on his way.

57.     At 1:17 p.m., LA FEVER was traffic stopped in his vehicle (TV #1) by an Arizona Department of Public Safety ("DPS") trooper in the vicinity of milepost 261 on eastbound Interstate 10. The trooper conducting the traffic stop approached LA FEVER in a manner consistent with a routine traffic stop. During the traffic stop, the trooper observed LA FEVER exhibiting extreme nervous behavior with excessive hand and body shaking for a normal traffic stop.

58.     The trooper noticed that LA FEVER had a cell phone on the front passenger seat with a text message in plain view. The trooper's report does not specify the make and model of this phone, but I believe it to be **Target Device A**. The trooper read the visible messages and saw a conversation about product and LA FEVER meeting someone (i.e., the UC) at the TTT truck stop.

59.     The trooper asked LA FEVER for consent to search and provided LA FEVER with a consent to search form.   While reading the consent to search form, LA FEVER admitted he had something in his pocket and provided the trooper with a plastic bag with a black chunky substance, which appeared to be consistent with black tar heroin and an additional plastic bag with an unknown white, powdery substance.   LAFEVER was then placed under arrest.   He later invoked his *Miranda* rights.

60.     LA FEVER's vehicle (TV #1) was searched incident to arrest and a black-and-white sling bag was located on the front passenger floorboard.   Inside the sling bag, troopers observed one vacuum-sealed plastic bag containing a large, white crystal-like substance and a brown-taped bundle wrapped inside clear cellophane.   The substance wrapped inside the brown-taped bundle was determined to be consistent with crystal methamphetamine.   In total, the suspected methamphetamine weighed approximately three pounds (gross weight).

61.     Investigators also found the following items, among others, in LA FEVER's vehicle: one Ruger Mark I .22 caliber pistol; one Iver Johnson TP22 .22 caliber pistol; over 450 rounds of assorted .22 caliber ammunition; three sticks (approximately two pounds) of Ireco Iremite, Class 2 high explosives; seven aircraft fire extinguisher squibs, which are explosive devices; three homemade pyrotechnics resembling M-80s, which are explosive devices; smokeless powder; green hobby fuse; one set of brass knuckles; knives; and a sword approximately two feet in length.

62.     **Target Device A** was seized from LA FEVER incident to his arrest.   Based on the available evidence, I believe it is likely that **Target Device A** is the telephone that LA FEVER used to communicate with the UC about the distribution of drugs (TD #2).

63.     On May 5, 2021, LA FEVER pleaded guilty to a felony Information alleging Conspiracy to Possess with Intent to Distribute Heroin and Methamphetamine in violation of federal law.

### Arrest of MILLER and Seizure of Target Devices B through D

64.     On the evening of November 12, 2020, another team of agents executed a federal search warrant (20-3110MB) on Room 120 of the Red Lion hotel, from where LA

FEVER was suspected to have gotten the methamphetamine.  Upon executing the warrant, investigators encountered Amanda Rachelle MILLER.  According to reports, MILLER was apprehended as she ran out the back door of the hotel room.  She later invoked her *Miranda* rights.

65.     Inside of Room 120, investigators found distribution-level quantities of suspected fentanyl pills, heroin, and methamphetamine, as well as a vacuum-sealer, a scale, over $25,000 in cash, and two suspected drug ledgers with names and telephone numbers, including the name and telephone number of a "Raul Rosales".  "Amanda" was written on the back cover of one of the ledgers.  **Target Device B** was found on MILLER's person, and **Target Devices C** and **D** were found in the hotel room.  MILLER's U.S. passport also was found in Room 120.  Agents later obtained hotel records showing that MILLER rented Room 120 for two nights beginning on November 12, 2020.  Documentation reflecting MILLER's rental of Room 120 also was recovered from the room itself.

66.     Several hours before agents executed the search warrant on Room 120, at 1:31 p.m., a DPS trooper saw a man drive up and park at the Red Lion hotel, briefly visit Room 120, and return to his vehicle where he seemed to re-arrange items in the trunk.  This man was later identified as Raul Rosales, and I believe this is the same person referenced in MILLER's ledger.  Once Rosales left the hotel, the trooper stopped him for an infraction. During the encounter, the trooper learned Rosales had an outstanding warrant for drug possession, and he was placed under arrest.

67.     Based on admissions Rosales made during the encounter and to inventory the vehicle, investigators searched his car and found 7.4 grams of suspected methamphetamine and 3.6 grams of suspected heroin hidden inside of a shoe in the trunk.  Rosales waived his *Miranda* rights and, according to reports, admitted that he had gotten the "glass and black," which I know to be slang terms for methamphetamine and heroin, respectively, from "Amanda," which I believe is a reference to Amanda MILLER.  Rosales also had a cellular telephone in his possession, which later was searched with a state warrant.

68.     After making her initial appearance in federal court, MILLER was released to in-patient drug treatment on or about December 16, 2020.  I am informed she absconded

from the treatment facility within approximately 24 hours of her arrival and is currently a fugitive.

69.     In January 2021, I received records from Square, Inc. in response to an earlier request for LA FEVER's transaction history with the company.  Square, Inc. provides peer-to-peer money transfer services enabling people to send and receive money, commonly by using an application on their cellular phones.  These records show that LA FEVER made the following payments to "Amanda Miller": $600.00 on August 18, 2020; $350.00 on September 4, 2020; $50.00 on September 10, 2020; $340.00 on September 19, 2020; and $90.00 on October 2, 2020 with a note stating, "payback."  The records further indicate that, on October 2, 2020, "Amanda Miller" sent or tried to send LA FEVER money, as follows: a "declined" transaction of $100.00, and a completed transaction of $240.00.[3]

**Arrest of SAMUELS and ACOSTA and Seizure of Target Devices E through K**

70.     While the events involving LA FEVER and MILLER were unfolding near downtown Tucson, another team of investigators tracked the Lincoln MKZ associated with SAMUELS to the Sonesta Suites hotel, approximately ten miles east of downtown.  Agents found the Lincoln in the hotel parking lot.

71.     At 4:40 p.m., agents approached the Lincoln to conduct a probable cause arrest of SAMUELS.  Upon approaching the parked vehicle, agents discovered SAMUELS and a subject later identified as Joseph ACOSTA.  SAMUELS was in the driver's seat, and ACOSTA was in the front passenger seat.

72.     According to reports, during the arrest, an agent saw a pistol sticking out of SAMUELS's pocket.  This firearm was identified as a Ruger LCP .380 pistol, which a few weeks earlier had been reported stolen by its rightful owner.  The magazine was loaded, but there was no round in the chamber of the pistol.  As ACOSTA was being taken into custody, another agent reportedly saw a different pistol fall out of ACOSTA's pants onto

---

[3] Square provided the dates and times of the transactions in Universal Coordinated Time.  I have not adjusted the times and dates to local Arizona time.

the passenger seat of the vehicle.  This pistol later was identified as a Sarsilmaz B6C 9mm pistol.  Its magazine was loaded, and there was a round in the chamber.

73.     SAMUELS consented to a search of the Lincoln.  Agents found a box on the driver's floorboard.  Inside of this box, agents located quantities of suspected heroin, crack cocaine, and methamphetamine, and over $3,500 in cash.

74.     Based on chain of custody forms, I believe **Target Devices E** through **J** were seized from SAMUELS, but I am unable to identify which of the subjects—SAMUELS or ACOSTA—was in possession of **Target Device K**.  All of **Target Devices E** through **K**, however, were seized incident to the arrest of SAMUELS and ACOSTA on November 12, 2020.

75.     SAMUELS waived his *Miranda* rights and, in sum, eventually admitted to knowing that he had illegal drugs in his vehicle and to selling drugs.  In a post-*Miranda* statement, ACOSTA admitted to being a drug user and that he knew SAMUELS as a methamphetamine dealer.  According to ACOSTA, he had met SAMUELS at the Sonesta Suites hotel to purchase drugs from him.  In his statement, SAMUELS denied that was the purpose of their meeting.  ACOSTA and SAMUELS each denied ownership of the seized firearms.

76.     Additionally, upon his arrest, agents discovered that SAMUELS had in his possession a "Notice of Penalty" form from Customs and Border Protection, Nogales.  The Notice was addressed to Amanda R. Miller notifying MILLER that she was liable for a fine of $400.00 for a violation of 19 U.S.C. § 1497.  On October 25, 2020, MILLER had attempted to enter the United States from Mexico with a small quantity of undeclared pills, which were identified to contain fentanyl.

77.     Finally, during ACOSTA's interview, he provided his telephone number as 520-719-5421.  I later searched toll records and discovered that, in October 2020, this number appeared on several occasions in the records for TD #3, the number provided by SAMUELS to the Flamingo Suites Hotel.  Therefore, I believe SAMUELS and ACOSTA previously had been in telephonic contact with one another.  Based on the totality of the circumstances, I also suspect that one of **Target Devices E** through **K** may be TD #3.

78.     Based on the above-reported findings and my experience, training, and knowledge of this investigation, I believe the **Target Devices** are likely to contain evidence of drug trafficking, in violation of 21 U.S.C. §§ 841, 843(b), 846, 952, 960 and 963; explosives- and/or firearms-related offenses, in violation of 18 U.S.C. §§ 842, 844(h)(2), 922(g), and 924(c); and money laundering, in violation of 18 U.S.C. §§ 1956 and 1957.

## TECHNICAL TERMS

79.     Based on my training and experience, the following technical terms are used to convey the following meanings:

a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.   Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data. Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.   GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records of the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.   PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.   For example,   PDA   users   can   work   with   word-processing   documents,

spreadsheets, and presentations.   PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

   f. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

   80. Based on my training, experience, and research, I believe that the **Target Devices** have capabilities that allow them to access the Internet and serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

   81. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

   82. There is probable cause to believe that things that were once stored on the **Target Devices** may still be stored there, for at least the following reasons:

   a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten.  In

addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

b. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

c. Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

83.   *Forensic evidence.*   As further described in **Attachment A.II.**, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Target Devices** were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the **Target Devices** because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

84.  *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant for which I am applying would permit the examination of the **Target Devices** consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

85.  *Manner of execution.*  Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion into a premise.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

## <u>CONCLUSION</u>

86.     I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **Target Devices** described in **Attachment A.I.** to seek the items particularly described in **Attachment A.II**.


Having signed this affidavit under oath, I state that its contents are true and correct to the best of my knowledge, information, and belief.

RICHARD A EUSTIS   Digitally signed by RICHARD A EUSTIS
Date: 2021.05.28 06:48:02 -07'00'

Richard Eustis, Special Agent
Homeland Security Investigations


Subscribed and sworn to before me telephonically this **28th** day of May, 2021.

Leslie A. Bowman
United States Magistrate Judge

23

21-03042MB

## ATTACHMENT A

I.   **Properties to be Searched**

The properties to be searched are as follows:

     a.  One black Samsung cellular telephone, bearing identification number 355182110367742 (**Target Device A**);

     b.  One red T-Mobile cellular telephone, bearing identification number 15729000104205 (**Target Device B**);

     c.  One white Apple iPhone cellular telephone in a teal case, bearing identification number 353102105520891 (**Target Device C**);

     d.  One black Samsung cellular telephone, bearing identification number 355356112835555 (**Target Device D**);

     e.  One black TCL cellular telephone (**Target Device E**);

     f.  One blue Cricket cellular telephone (**Target Device F**);

     g.  One black Apple iPhone cellular telephone, bearing identification number 356474104960809 (**Target Device G**);

     h.  One black Verizon cellular telephone, bearing identification number 352157108298813 (**Target Device H**);

     i.  One black Samsung cellular telephone, bearing identification number 352656110918854 (**Target Device I**);

     j.  One black Apple iPhone cellular telephone, bearing identification number 352895117318797 (**Target Device J**); and

     k.  One black Samsung cellular telephone, bearing identification number 355357112073460 (**Target Device K**).

**Target Device A** was seized incident to the arrest of Patrick Michael LA FEVER.  **Target Devices B** through **D** were seized incident to the arrest of Amanda Rachelle MILLER. **Target Devices E** through **K** were seized incident to the arrest of Jamaar Charles SAMUELS and Joseph ACOSTA.

Collectively, **Target Devices A** through **K** are referred to as the **Target Devices**. All **Target Devices** were seized on November 12, 2020 in Tucson, Arizona and were

ultimately transferred into Homeland Security Investigations (HSI) custody. The **Target Devices** are currently located at a secure HSI storage facility in Nogales, Arizona.

## II.    Items to Be Seized

1.      All records on the **Target Devices** that relate to drug trafficking, in violation of 21 U.S.C. §§ 841, 843(b), 846, 952, 960 and 963; prohibited conduct involving explosives and firearms, in violation of 18 U.S.C. §§ 842, 844(h)(2), 922(g) and 924(c); or money laundering, in violation of 18 U.S.C. §§ 1956 and 1957; and that further involve Patrick Michael LA FEVER, Amanda Rachelle MILLER, Jamaar Charles SAMUELS, Joseph ACOSTA, or any other participant in the aforementioned crimes since January 1, 2019, including:

a.  identities of persons involved in any capacity in the purchase, sale, importation, distribution, or possession of controlled substances, including their names, physical addresses, telephone numbers, e-mail addresses, or social media identifiers;

b.  types, amounts, and prices of drugs trafficked;

c.  dates, places, and amounts of completed or attempted drug transactions;

d.  identifies of persons involved in any capacity in the purchase, sale, trade, transfer, possession, transportation or importation/exportation of firearms, ammunition, or explosives, including their names, physical addresses, telephone numbers, e-mail addresses, or social media identifiers;

e.  types, amounts, and prices of firearms, ammunition, or explosives purchased, sold, traded, transferred, possessed, transported, or imported/exported;

f.  dates, places, and amounts of completed or attempted transactions involving firearms, ammunition, or explosives;

g.  types and amounts of money obtained, received, exchanged, deposited, withdrawn, or delivered;

h.  Dates, places, exchange rates, and amounts of completed or attempted monetary or financial transactions;

i.  all bank records, checks, credit card bills, account information, receipts, invoices, and other financial records;

j.  information pertaining to vehicles used to transport drugs, firearms, ammunition, explosives or money, including vehicle registration information;

k.  information pertaining to buildings or structures used to store drugs, firearms, ammunition, explosives, or money, including physical addresses and title or rental documents;

l.  any information recording the schedule, travel, or location of LA FEVER, MILLER, SAMUELS, or ACOSTA, including GPS data, from January 1, 2019 to the present, further including the schedule, travel or location of any co-conspirator; and

m. all communications between or among any of LA FEVER, MILLER, SAMUELS, ACOSTA or any other co-conspirator, related to drug trafficking, in violation of 21 U.S.C. §§ 841, 843(b), 846, 952, 960 and 963; prohibited conduct involving explosives and firearms, in violation of 18 U.S.C. §§ 842, 844(h)(2), 922(g) and 924(c); or money laundering, in violation of 18 U.S.C. §§ 1956 and 1957.

2.     Evidence of user attribution showing who used or owned the **Target Devices** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.